# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **FATHERS & DAUGHTERS NEVADA, LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **LINGFU ZHANG**, <br><br> Defendant. | Case No. 3:16-cv-1443-SI <br><br> **OPINION AND ORDER** |

Carl D. Crowell, CROWELL LAW, PO Box 923, Salem, OR 97308. Of Attorneys for Plaintiff.

David H. Madden, MERSENNE LAW, 9600 SW Oak Street, Suite 500, Tigard, OR, 97223. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

      Plaintiff Fathers & Daughters Nevada, LLC ("F&D") brings this action against Defendant Lingfu Zhang. F&D alleges that Defendant copied and distributed F&D's motion picture *Fathers & Daughters* through a public BitTorrent network in violation of F&D's exclusive rights under the Copyright Act. Before the Court is Defendant's motion for summary judgment. Defendant argues that F&D is not the legal or beneficial owner of the relevant

exclusive rights under the Copyright Act and thus does not have standing to bring this lawsuit. For the following reasons, the Court grants Defendant's motion.

## STANDARDS

### A. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

### B. Standing Under the Copyright Act

"Under the Copyright Act, only the 'legal or beneficial owner of an exclusive right under a copyright' has standing to sue for infringement of that right." *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013) (quoting 17 U.S.C. § 501(b)).[1] The "exclusive rights" that can

---

[1] Section 501(b) states: "The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."

be held under the Copyright Act are enumerated in Section 106. "They are the rights 'to do and to authorize' others to do six things with the copyrighted work: to reproduce the work, to prepare derivative works based upon the work, to distribute copies of the work, to perform the work publicly, to display the work publicly, and to record and perform the work by means of an audio transmission." *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir. 2015). This list of exclusive rights is exhaustive. *Id.* It does not include the right to sue for infringement. *See Righthaven*, 716 F.3d at 1169 ("Absent from the list of exclusive rights is the right to sue for infringement."). Thus, a copyright holder cannot assign or transfer a bare right to sue. *Id.*; *see also DRK Photo v. McGraw-Hill Global Educ. Holdings, LLC*, 870 F.3d 978, 987 (9th Cir. 2017) (holding that the substance and effect of the assignments and agreements purporting to assign ownership were "merely a transfer of the right to sue on accrued claims, which cannot confer standing" under the Copyright Act); *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 890 (9th Cir. 2005) ("The bare assignment of an accrued cause of action is impermissible under 17 U.S.C. § 501(b).").

Ownership, and how it can be transferred and parsed, is unique under the Copyright Act:

> A 'transfer of copyright ownership' is an assignment, mortgage, *exclusive license*, or any other conveyance, alienation, or hypothecation of a copyright *or of any of the exclusive rights* comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

17 U.S.C. § 101 (emphasis added). Thus, an owner of a copyright can transfer ownership of a copyright "via an assignment or *an exclusive license*" and both "constitute a 'transfer of copyright ownership.'" *Righthaven*, 716 F.3d at 1170 (emphasis added) (quoting 17 U.S.C. § 101). "[I]f a copyright owner grants an exclusive license of particular rights, *only the exclusive licensee and not the original owner* can sue for infringement of those rights." *Id.* (emphasis

added) (citing 3 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 1202[C] (2012)); *see also* J. Ginsburg & R. Gorman, COPYRIGHT LAW, Ch. 3.II.A (2012) ("Ginsburg").

An owner of a copyright who transfers exclusive rights may still have standing to sue on those rights if the owner qualifies as a "beneficial owner" of those rights. *See* Ginsburg, *supra*, at Ch. 3.II.A. The Copyright Act does not define the term "beneficial owner." "The classic example of a beneficial owner is 'an author who ha[s] parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.'" *DRK Photo*, 870 F.3d at 988 (alteration in original) (quoting *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003)). "Beneficial ownership arises by virtue of section 501(b) for the purpose of enabling an author or composer to protect his economic interest in a copyright that has been transferred." *Broad. Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997).

## BACKGROUND

### A. Sales Agency Agreement

F&D is the author and registered the copyright for the screenplay and motion picture *Fathers & Daughters*. ECF 36-1. On December 20, 2013, with an effective date of April 1, 2013, F&D entered into a sales agency agreement with Goldenrod Holdings ("Goldenrod") and its sub-sales agent Voltage Pictures, LLC ("Voltage"). ECF 36-2. Under this agreement, F&D authorized Goldenrod and Voltage as "Sales Agent" to license most of the exclusive rights of *Fathers & Daughters*, including rights to license, rent, and display the motion picture in theaters, on television, in airplanes, on ships, in hotels and motels, through all forms of home video and on demand services, through cable and satellite services, and via wireless, the internet, or streaming. F&D reserved all other rights, including merchandising, novelization, print publishing, music publishing, soundtrack album, live performance, and video game rights. ECF 36-2 at 3.

PAGE 4 – OPINION AND ORDER

F&D further authorized Goldenrod and Voltage to execute agreements in their own name with third parties for the "exploitation" of the exclusive rights of *Fathers & Daughters* and agreed that Goldenrod and Voltage had "the sole and exclusive right of all benefits and privileges of [F&D] in the Territory, including the exclusive right to collect (in Sales Agent's own name or in the name of [F&D] . . .), receive, and retain as Gross Receipts any and all royalties, benefits, and other proceeds derived from the ownership and/or the use, reuse, and exploitation of the Picture . . . ." ECF 36-2 at 4. The "Territory" is defined as the "universe." *Id.*

The sales agency agreement sets forth how Gross Receipts will be distributed. ECF 36-2 at 6-8. There are eight enumerated payment categories, listed in payment priority order. The first is costs of production, with a capped amount that is redacted in the copy provided to the Court. The second is overhead and a producer fee equal to a lesser amount that also is redacted in the Court's copy. The third is a marketing fee to Goldenrod and Voltage. The fourth includes recoupable expenses (which were previously defined) to Goldenrod and Voltage. The fifth includes other described fees and costs. The sixth consists of certain payments to Goldenrod and Voltage that are redacted in the Court's copy. The seventh is box office bonuses or other deferments not assumed by third party domestic distributors. The eighth is approved deferments, which are redacted in the Court's copy. After these eight specified categories, any remaining amounts are to be considered "adjusted gross receipts." The adjusted gross receipts are to be divided in a manner that is wholly redacted in the document provided to the Court.

**B. Distribution Agreement with Vertical**

On October 2, 2015, Goldenrod entered into a distribution agreement with Vertical Entertainment, LLC ("Vertical"). ECF 36-5. Under this agreement, Goldenrod granted to Vertical a license in the motion picture *Fathers & Daughters* in the United States and its territories for the:

PAGE 5 – OPINION AND ORDER

> sole and exclusive right, license, and privilege . . . under copyright, including all extensions and renewal terms of copyright, in any and all media, and in all versions, to exploit the Rights and the Picture, including, without limitation, to manufacture, reproduce, sell, rent, exhibit, broadcast, transmit, stream, download, license, sub-license, distribute, sub-distribute, advertise, market, promote, publicize and exploit the Rights and the Picture and all elements thereof and excerpts therefrom, by any and every means, methods, forms and processes or devices, now known or hereafter devised, in the following Rights only, under copyright and otherwise

ECF 36-5 at 3 (¶ 7(a)). The "rights" enumerated include: (i) theatrical rights; (ii) non-theatrical rights, meaning prisons, educational institutions, libraries, museums, army bases, hospitals, etc., but expressly excluding ships and airlines; (iii) videogram rights, meaning videocassettes, DVDs, blue-ray discs, CD-ROMs, and similar media; retail channels including "through standard retail channels by means of download to any tangible or hard carrier Videogram storage device using any and all forms of digital or electronic transmission to the retailer," and internet based retailers; (iv) television rights; (v) digital rights, meaning the exclusive right "in connection with any and all means of dissemination to members of the public via the internet, 'World Wide Web' or any other form of digital, wireless and/or Electronic Transmission . . . including, without limitation, streaming, downloadable and/or other non-tangible delivery to fixed and mobile devices," which includes "transmissions or downloads via IP protocol, computerized or computer-assisted media" and "all other technologies;" (vi) pay-per-view and video-on-demand rights; and (vii) incidental rights. ECF 36-5 at 3-5 (¶¶ 7(a)(i)-(vii)). The rights granted also include the right to assign, license, or sublicense any of these rights. *Id.* at 5 (¶ 7(b)).

In addition to reserving the rights to ships and airlines to Goldenrod, the distribution agreement also reserves to Goldenrod the clip rights, stock footage, merchandising, soundtrack, sequel, prequel, remakes, spin-offs, and royalties from retransmission and other collection agencies. ECF 36-5 at 5 (¶ 7(c)(i)). The distribution agreement also purports to retain to

PAGE 6 – OPINION AND ORDER

Goldenrod the right to pursue for damages, royalties, and costs actions against those unlawfully downloading and distributing *Fathers & Daughters* via the internet, including using peer-to-peer or BitTorrent software. ECF 36-5 at 6 (¶ 7(c)(iii)). This clause purports to retain "the right to pursue copyright infringers in relation to works created or derived from the rights licensed pursuant to this Agreement." *Id.* Shortly thereafter, however, Goldenrod and Vertical confirm and agree that "Internet and ClosedNet Rights (and all related types of transmissions) (*e.g.*, Wireless/Mobile Rights) shall be included in the Rights licensed herein)" as long as Vertical uses commercially reasonable efforts to ensure security. *Id.* (¶ 7(c)(d)). Vertical was required to use commercially reasonable efforts to ensure that Vertical's internet distribution and streaming could only be received within its contract territory, was made available over a closed network where the movie could be accessed by only authorized persons, and could only be accessed in a manner that prohibited circumvention of digital security or digital rights management security features. F&D does not assert that Vertical breached this provision of the agreement or did not use commercially reasonable efforts to ensure digital security or its territorial limitations.

Similar to the sales agency agreement, most of the financial information of the distribution agreement also is redacted in the copy provided to the Court. ECF 36-5 at 8. Nevertheless, it appears that Vertical was to receive certain fees and costs first, and then Goldenrod was to receive certain monies. The term of the distribution agreement was from the initial release date of *Fathers & Daughters* to certain triggering events that have been redacted in the copy provided to the Court. ECF 36-5 at 3. F&D does not assert that this agreement was no longer in effect at the time this lawsuit was commenced.

## DISCUSSION

F&D asserts that it is both the legal owner and the beneficial owner of the copyright to *Fathers & Daughters*, which would give F&D standing to bring this infringement suit against

PAGE 7 – OPINION AND ORDER

Defendant. F&D misstates the law of legal ownership of copyright exclusive rights and thus its argument that it is the legal owner of the exclusive rights at issue in this lawsuit is rejected. F&D also fails to present evidence that create a genuine dispute of material fact that F&D is the beneficial owner of the relevant exclusive right. Thus, that argument is similarly rejected. F&D also argues that based on a reservation of rights in the distribution agreement with Vertical and in a separate addendum to the agreements, F&D has standing. This argument also is without merit.

## A. Evidentiary Objections

As a threshold matter, F&D objects on relevancy grounds to three exhibits submitted by Defendant, Exhibits B, C, and D. Defendant concedes that Exhibit D may be disregarded. Accordingly, F&D's objection to Exhibit D is sustained. The Court overrules F&D's objection to Exhibit C. Exhibit C is an "Anti-Internet Piracy Authorisation" agreement dated April 1, 2015, in which F&D empowers Voltage with a limited power of attorney to investigate and collect evidence relating to copyright infringers of *Fathers & Daughters*, decide whether to file lawsuits, choose counsel, decide on settlement, and make other related decisions. ECF 36-3. This document is relevant to Defendant's argument that a later Anti-Piracy Addendum relied on by F&D was created after this lawsuit was filed. The Court also overrules F&D's objection to Exhibit B, the sales agency agreement. Exhibit B is relevant because it establishes Goldenrod's authority to enter into the licensing agreement with Vertical that provides Vertical with the exclusive license to the relevant rights in *Fathers & Daughters*. It is also relevant to the financial relationship between Goldenrod and F&D, which is relevant to F&D's argument regarding beneficial ownership.

## B. Standing as the Legal Owner

The legal owner of a copyright has standing. F&D argues that it is the legal owner because it registered the copyright and the copyright remains registered in its name. This

Defendant. F&D misstates the law of legal ownership of copyright exclusive rights and thus its argument that it is the legal owner of the exclusive rights at issue in this lawsuit is rejected. F&D also fails to present evidence that create a genuine dispute of material fact that F&D is the beneficial owner of the relevant exclusive right. Thus, that argument is similarly rejected. F&D also argues that based on a reservation of rights in the distribution agreement with Vertical and in a separate addendum to the agreements, F&D has standing. This argument also is without merit.

## A. Evidentiary Objections

As a threshold matter, F&D objects on relevancy grounds to three exhibits submitted by Defendant, Exhibits B, C, and D. Defendant concedes that Exhibit D may be disregarded. Accordingly, F&D's objection to Exhibit D is sustained. The Court overrules F&D's objection to Exhibit C. Exhibit C is an "Anti-Internet Piracy Authorisation" agreement dated April 1, 2015, in which F&D empowers Voltage with a limited power of attorney to investigate and collect evidence relating to copyright infringers of *Fathers & Daughters*, decide whether to file lawsuits, choose counsel, decide on settlement, and make other related decisions. ECF 36-3. This document is relevant to Defendant's argument that a later Anti-Piracy Addendum relied on by F&D was created after this lawsuit was filed. The Court also overrules F&D's objection to Exhibit B, the sales agency agreement. Exhibit B is relevant because it establishes Goldenrod's authority to enter into the licensing agreement with Vertical that provides Vertical with the exclusive license to the relevant rights in *Fathers & Daughters*. It is also relevant to the financial relationship between Goldenrod and F&D, which is relevant to F&D's argument regarding beneficial ownership.

## B. Standing as the Legal Owner

The legal owner of a copyright has standing. F&D argues that it is the legal owner because it registered the copyright and the copyright remains registered in its name. This

simplistic view of ownership of a copyright misunderstands that copyright "ownership" can be transferred through an exclusive license (or otherwise), and can be transferred in pieces. *Righthaven*, 716 F.3d at 1170; *see also* 17 U.S.C. § 101.

In the sales agency agreement, F&D authorized Goldenrod to license F&D's exclusive rights in *Fathers & Daughters*. In the distribution agreement, Goldenrod granted to Vertical a license in many of the exclusive rights of *Fathers & Daughters* as enumerated under copyright law. The first question is whether F&D, through Goldenrod, granted Vertical an exclusive license, which is a transfer of ownership, or a nonexclusive license, which is not a transfer of ownership. *See* 17 U.S.C. § 101.

The agreement is clear that Vertical was granted an exclusive license for the rights that were transferred. It is true that not all rights were transferred to Vertical, but under the Copyright Act of 1976, a copyright owner need not transfer all rights. *See Minden*, 795 F.3d at 1002 ("The Copyright Act, however, eradicated much of the doctrine of indivisibility by permitting a copyright owner to transfer [a]ny of the exclusive rights comprised in a copyright, including any subdivision of any of the[se] rights, to someone else." (alterations in original) (quotation marks and citation omitted)). The copyright owner may also "subdivide his or her interest" in an exclusive right by transferring "his or her share 'in whole or in part' to someone else." *Id.* (quoting 17 U.S.C. §201(d)(1)).

The critical inquiry is to consider whether the substance of the rights or portions of rights that were licensed were exclusive or nonexclusive. Vertical plainly received exclusive rights. Vertical received the exclusive right to "manufacture, reproduce, sell, rent, exhibit, broadcast, transmit, stream, download, license, sub-license, distribute, sub-distribute, advertise, market, promote, publicize and exploit the Rights and the Picture and all elements thereof and excerpts

therefrom" in the United States and its territories for almost all distribution outlets, except airlines and ships. This constitutes an exclusive license.

An exclusive license serves to transfer "ownership" of a copyright during the term of the license. *Righthaven*, 716 F.3d at 1170; *see also* 17 U.S.C. § 101. Thus, for the exclusive rights licensed to Vertical, Vertical is the "legal owner" for standing under the Copyright Act, and not F&D. F&D argues that because it did not license to Vertical all of its rights in *Fathers & Daughters*, including rights to display the movie on airlines and ships, rights to the movie clips, and rights to stock footage, F&D remains the legal owner of the copyright with standing to bring this infringement claim. F&D misunderstands Section 501(b) of the Copyright Act.

As Section 501(b) states, and the Ninth Circuit has made clear, after a copyright owner has fully transferred an exclusive right, it is the transferee who has standing to sue *for that particular exclusive right*. *See* 17 U.S.C. § 501(b); *Righthaven*, 716 F.3d at 1170; *see also* Ginsburg, *supra*, at Ch. 3.II.A (noting that if a copyright owner licenses an exclusive right to another, it is the licensee of the exclusive right "who can properly bring an action for infringement of that particular exclusive right"). The copyright owner need not transfer all of his or her exclusive rights, and will still have standing to sue as the legal owner of the rights that were not transferred. *See Minden*, 795 F.3d at 1004-05; *see also DRK Photo*, 80 F.3d at 984. But the copyright owner no longer has standing to sue for the rights that have been transferred. *See Righthaven*, 716 F.3d at 1170 ("[I]f a copyright owner grants an exclusive license *of particular rights*, only the exclusive licensee and not the original owner can sue for infringement *of those rights*." (emphasis added)); *see also* 17 U.S.C. § 501(b) (""The legal or beneficial owner of *an exclusive right* under a copyright is entitled . . . to institute an action for any infringement *of that particular right* committed while he or she is the owner of it." (emphasis added)); 3 M. Nimmer

& D. Nimmer, NIMMER ON COPYRIGHT § 12.02[c] (2017) ("Once the copyright owner grants an exclusive license of particular rights, only the exclusive licensee, and not his grantor, may sue for later-occurring infringement of those rights. Indeed, the licensor may be liable to the exclusive licensee for copyright infringement, if the licensor exercises rights that have theretofore been exclusively licensed.").[2]

The second question in this case is whether the exclusive rights transferred to Vertical, and for which Vertical is thus the "legal owner," include the rights at issue in this lawsuit. This lawsuit claims that Defendant illegally downloaded *Fathers and Daughters* over the internet, via a computer, using BitTorrent software. This squarely falls within the digital rights exclusively licensed to Vertical in Paragraph 7(a)(v) of the distribution agreement. Defendant is a "member of the public" who allegedly obtained the movie "via the internet, 'World Wide Web' or any other form of digital, wireless and/or Electronic Transmission . . . and/or other non-tangible delivery or fixed and mobile devices, platforms and services, whether now known or hereafter devised," and the movie was allegedly transmitted via "electronic and/or data transmissions or

---

[2] The Ninth Circuit may have created some confusion in this analysis with *Minden's* holding that in an agreement where the copyright holder expressly retains legal ownership: (1) a copyright owner can retain some "limited degree" of an "exclusive right," (2) a copyright owner can license the remaining portion of that "exclusive right" to another, and (3) the licensee would have standing to sue as the recipient of an exclusive license of the right transferred to the licensee. *Minden*, 795 F.3d at 1004-06; *see also DRK Photo*, 80 F.3d at 984 (describing the holding in *Minden*). The ability of an "exclusive right" to be held fractionally between two parties seems to be contrary to the meaning of "exclusive"—and contrary to *Righthaven's* holding and the leading treatises' conclusions that after an exclusive right has been transferred only the licensee and not the owner can enforce that exclusive right. The Court, however, need not address that tension here because Goldenrod did not retain any portion of the exclusive rights it licensed to Vertical. Accordingly, that aspect of *Minden* is inapplicable to the case at bar. Although Goldenrod did not license certain rights (such as display and distribution to airlines), for the rights that were licensed, they were licensed in their entirety and thus served as a transfer of ownership of the copyright for those exclusive rights. Moreover, the distribution agreement did not contain a clause expressly retaining copyright ownership to F&D (as did the agreement at issue in *Minden*).

streaming or downloads or embeds, including, without limitation, transmissions or downloads via IP protocol, computerized or computer-assisted media." ECF 36-5 at 4 (¶ 7(a)(v)). The alleged violation also includes illegally viewing the movie in the United States, which is the exclusive broadcast territory of Vertical, except for airplanes and oceanliners, which are not relevant to this lawsuit.

F&D also argues that because Paragraph 7(d) of the distribution agreement requires Vertical to use commercially reasonable efforts to ensure that its internet distribution and streaming were limited to the contract territory (the United States and its territories), were on a closed network, and were only accessible to networks prohibiting circumvention of digital rights management security and other digital security, this means that the contract reserved BitTorrent rights to Goldenrod. That is not, however, what Paragraph 7(d) provides. Paragraph 7(a) of the distribution agreement grants Vertical extremely broad rights, including comprehensive digital rights. Paragraph 7(b) grants Vertical the right to authorize others to the rights of *Fathers and Daughters*. Paragraph 7(c) reserves certain rights to Goldenrod, not relevant here. Finally, Paragraph 7(d) merely reaffirms that certain digital rights *belong to Vertical* and then applies commercially reasonable requirements to Vertical's exercise of those rights, primarily security terms. Paragraph 7(d) does not reserve any exclusive copyright digital rights to Goldenrod.

Under the Copyright Act, F&D is not the "legal owner" with standing to sue for infringement relating to the rights that were transferred to Vertical through its exclusive license granted in the distribution agreement. These rights include displaying or distributing copies of *Fathers & Daughters* in the United States and its territories. They further include displaying or distributing via the internet, using IP protocol, using computers, and using "all other technologies, both now or hereafter known or devised," which includes using BitTorrent

protocol. In the distribution agreement Goldenrod (and therefore F&D) did not retain any fraction or portion of these digital rights. Because the infringement in this case relates to rights transferred to Vertical and there is no alleged infringement relating to display on airlines, display on ships, movie clips, stock footage, or any other rights that F&D retained, F&D does not have standing as the legal owner to bring the claims alleged.

C. Standing as the Beneficial Owner

A beneficial owner of a copyright may also have standing. F&D argues that it has standing as the beneficial owner of the copyright because it receives royalties for the licensing of the movie to Vertical. In support, F&D summarily asserts that the distribution agreement with Vertical states that F&D is entitled to "Licensor Net Receipts" from Vertical. The problem with this argument is that the "Licensor" in the distribution agreement is Goldenrod, not F&D. So it is Goldenrod who is entitled to those net receipts from the distribution agreement. F&D offers no argument or evidence of how the money Goldenrod receives from Vertical qualifies as royalties payable to F&D. Courts have "no independent duty 'to scour the record in search of a genuine issue of triable fact,' and may 'rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.'" *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)).

Nonetheless, the Court has reviewed the sales agency agreement to see if it elucidates how Goldenrod's receipts from Vertical might be payable as royalties to F&D. The sales agency agreement provides that Goldenrod may enter into license agreements and collect monies in its own name. Thus, Goldenrod may collect the monies from Vertical in Goldenrod's name. The sales agency agreement also provides, however, that monies obtained from licensing the movie

shall be deemed "Gross Receipts." As described in the factual background section, the first eight steps in distributing Gross Receipts could not be considered royalties to F&D.

It is conceivable that in the final step, after the monies become "adjusted gross receipts," there may be some type of distribution that might be considered royalties to F&D. That entire section, however, is redacted in the copy provided to the Court. Thus, there is no way for the Court to know whether the adjusted gross receipts are divided in such a manner that could be considered royalties to F&D. F&D did not provide the Court with an unredacted copy or any evidence showing how F&D can be deemed to be receiving royalties. The Court would have to engage in pure speculation as to how adjusted gross receipts are divided, and the Court will not do so. Accordingly, there is no evidence before the Court that F&D receives anything from the sales agency agreement that looks like royalties, let alone that F&D receives royalties from the distribution agreement with Vertical. F&D therefore fails to show a genuine dispute that it is the beneficial owner with respect to the exclusive rights licensed to Vertical.

### D. Contractual Reservation of Right to Sue Clause

F&D also argues that because the distribution agreement between Goldenrod and Vertical contained a reservation of the right to sue for infringement via BitTorrent and other illegal downloading via the internet, F&D has standing to sue. This argument fails for two reasons. First, the reservation of rights was to Goldenrod and not to F&D. Thus, even if the clause could convey standing, it does not convey standing to F&D.

Second, the Ninth Circuit has repeatedly held that agreements and assignments cannot convey simply a right to sue, because a right to sue is not an exclusive right under the Copyright Act. *See DRK Photo*, 870 F.3d at 987-88; *Righthaven*, 716 F.3d at 1169-70; *Silvers*, 402 F.3d at 890. If a party cannot transfer a simple right to sue, the Court finds that a party similarly cannot retain a simple right to sue. Just as Goldenrod (or F&D) could not assign or license to

PAGE 14 – OPINION AND ORDER

Vertical or anyone else no more than the right to sue for infringement, it cannot transfer the substantive Section 501(b) rights for display and distribution in the United States and its territories, including digital rights, but retain only the right to sue for one type of infringement of those transferred rights (illegal display and distribution over the internet).

**E.  Anti-Piracy Addendum**

F&D also relies on an undated "Anti-Piracy and Rights Enforcement Reservation of Rights Addendum." ECF 36-7. This document provides that "all peer-to-peer digital rights (BitTorrent, etc.) in the Picture, including international rights, are reserved to [F&D]," that F&D shall be authorized to issue Digital Millennium Copyright Act take down notices against any infringer, that F&D shall be authorized to "enforce copyrights against Internet infringers including those that use peer-to-peer technologies in violation of U.S. Copyright law," and that there shall be no cost to Vertical with regards to these enforcement actions. This document does not provide F&D with standing for two reasons.

First, the Ninth Circuit instructs courts in considering copyright assignments and agreements to consider substance over form. *See DRK Photo*, 870 F.3d at 986-87; *Righthaven*, 716 F.3d at 1169-70. From the context of this document, it is clear that the peer-to-peer and BitTorrent rights being reserved to F&D are *infringing* rights. The substance of this Addendum is to confer no more than the right to issue take down notices and sue for copyright infringement for infringing peer-to-peer use through illegal downloading via the internet. The rights to digital display and distribution, which are exclusive rights under the Copyright Act, remain with Vertical. Accordingly, these "reserved" rights are not exclusive rights under the Copyright Act and thus do not confer standing.

Second, F&D provides no evidence in the record that this document was executed before this lawsuit was filed. As discussed above, F&D did not have any digital rights in *Fathers &*

PAGE 15 – OPINION AND ORDER

*Daughters* in the United States and its territories and thus did not have standing. Even if this document could provide F&D with rights that would confer standing upon F&D, standing is considered at the time a lawsuit is filed. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992). Although there are a few exceptions to this rule, as the Ninth Circuit noted in *Righthaven*, "permitting standing based on a property interest acquired after filing is not one of them." 716 F.3d at 1171. In *Righthaven*, the Ninth Circuit declined to decide whether a late contractual addendum to "clarify" copyright assignments "call[ed] for a new exception to the general rule." *Id.* Instead, the court found that the plaintiff lacked standing either way. Under existing Ninth Circuit precedent, there is no such additional exception to the general rule.

In his motion, Defendant expressly noted that the anti-piracy addendum was undated, produced near the end of discovery, and "upon information and belief" was created after this lawsuit was filed. Notably, no other agreement in the record is undated. Additionally, in April 2015, several months before the distribution agreement was executed in October 2015, an anti-piracy agreement that was signed and dated authorized Voltage to investigate and pursue infringers, not F&D.

In its response, F&D did not dispute that the undated anti-piracy addendum was created after this lawsuit was filed, or otherwise respond to Defendant's standing argument relating to the untimeliness of this document. Nor did F&D provide any evidence as to the date this document was created. Therefore, the only reasonable inference is that this document was created after this lawsuit was filed. Accordingly, because the only reasonable inference supported by the evidence is that this document was created after the filing of this lawsuit, it is not appropriate to consider for purposes of standing.

F.  **Informal Request to Amend**

At oral argument, Plaintiff's counsel requested leave to amend to add additional plaintiffs if the Court were "inclined" to grant Defendant's motion. Summary judgment is not the time to amend pleadings. *See, e.g.*, *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (finding that when allegations are not in the complaint, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court"); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("'Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (quoting *Fleming v. LindWaldock & Co.*, 922 F.2d 20, 24 (1st Cir.1990)); *Pickern v. Pier I Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (new issues raised in response to summary judgment were not appropriate for consideration). Plaintiff's informal request to amend is denied.

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF 34) is GRANTED. Plaintiff's claims are dismissed for lack of standing.

**IT IS SO ORDERED**.

DATED this 17th day of January, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge