John Mansfield, OSB No. 055390
john@harrisbricken.com
Megan Vaniman, OSB No. 124845
megan@harrisbricken.com
HARRIS BRICKEN
511 SE 11th Ave., Ste. 201
Portland, OR  97214
503-207-7313
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **FATHERS & DAUGHTERS NEVADA, LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **LINGFU ZHANG**, <br><br> Defendant. | Case No.: 3:16-cv-01443-SI <br><br><br> **PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT UNDER F.R.C.P. 59(e) OR IN THE ALTERNATIVE, FOR RELIEF FROM A JUDGMENT UNDER F.R.C.P. 60(b)** |

## MOTION

Plaintiff Fathers & Daughters Nevada, LLC moves this Court to alter or amend the Final Judgment dated January 17, 2018 pursuant to Rule 59(e) [ECF 47], or in the alternative, for relief from the Final Judgment and Opinion And Order dated January 17, 2018 pursuant to Rule 60(b) [CF 46]. The Motion will be based on this notice, the records, pleadings, and documents on file in the within action, the accompanying Memorandum of Points and Authorities and

- 1 -    PLAINTIFF'S MOTION UNDER F.R.C.P. 59(e) OR F.R.C.P. 60(b)

supporting Declaration of Sean Walsh on such other further oral and documentary evidence as may be presented at the time of hearing on this Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

In its Opinion and Order of January 17, 2018, this Court granted summary judgment, holding that Plaintiff Fathers & Daughters Nevada, LLC ("F&D") lacked standing on two grounds:

(i)      F&D was not the legal owner of the "peer-to-peer" copyright rights in issue because such rights had been exclusively licensed to Vertical Entertainment, LLC ("Vertical"); and

(ii)      F&D was not the beneficial owner of such rights because the Sales Agency Agreement with Goldenrod Holdings and Voltage Pictures, LLC (together "Goldenrod") assigned *all* gross receipts from *all* licensing activities to Goldenrod and the court could not determine whether F&D retained any beneficial interest.

## II.   AUTHORIZATION FOR RECONSIDERATION

Under Rule 59(e):  "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Under Rule 60(b): "The court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect… or (6) any other reason that justifies relief."

"A district court may reconsider its grant of summary judgment under either Federal Rule of Civil Procedure 59(e) [or] 60(b) … Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."' *School District No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993), *cert. denied*, 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994); *EEOC v. Lockheed Martin Corp.*, 116 F3d 110, 112 (4th Cir 1997). F&D submits that because the Final Judgment and Opinion And Order dated January 17,

2018 is in direct conflict with the terms of the written agreements and applicable law, they should be vacated as clear error or manifest injustice.

III.   **THE SALES AGENCY AGREEMENT ESTABLISHES THAT F&D IS A BENEFICIAL OWNER.**

As indicated in the Opinion and Order, F&D can have standing as either a legal or beneficial copyright owner. For simplicity, it is useful to start with beneficial ownership. F&D is a beneficial owner if it is entitled to receive royalties (*i.e.*, a share of gross receipts) payable under the Vertical Agreement. Whatever doubt there may be on this matter likely arises from a misunderstanding of certain technical terms in the relevant agreements.

The Opinion and Order appears to assume that under the Sales Agency Agreement: (i) Paragraph 4.e assigns *all* gross receipts from *all* licensing activities to Goldenrod; and (ii) Paragraph 10 only provides for the remaining "adjusted gross receipts" to be credited F&D, and the court is unable to determine this amount. However, Paragraph 4.e is a technical provision that only authorizes collection of certain limited *collateral* income. Paragraph 10 provides that F&D is entitled to all *gross* receipts. The indicated payments in Paragraph are basically to *creditors* of F&D, not payments of royalties to other "beneficial owners." Paragraph 11 further confirms that all *gross* receipts, including royalties from the Vertical Agreement, are to be paid directly to a "Collection Agreement" for the benefit of F&D, establishing a direct payment of royalties to F&D and a resulting beneficial ownership interest.

A.   **Paragraph 4.e does not apply to all gross receipts from all sources but is limited to certain collateral receipts.**

Paragraph 4.e is contained in the section on "Engagement of Sales Agent." This is a technical provision regarding the authority of the Sales Agent, and is different from the general allocation of Gross Receipts in Paragraph 10. To understand the scope of Paragraph 4.e it is critical to read the provision in its entirety:

> The parties agree that expressly included within the Rights is the sole and exclusive right of all benefits and privileges of Producer in the Territory**, including the exclusive right to collect (in Sales Agent's own name or in the name of Producer and Producer hereby appoints Sales Agent as Producer's**

**irrevocable lawful attorney-in-fact solely for such purpose),** receive, and retain as Gross Receipts any and all royalties, benefits, and other proceeds derived from the ownership of and/or the use, reuse, and exploitation of the Picture (and any and all rights therein) in the Territory, **under any and all collection and payment schemes or procedures in the Territory, whether now in existence or hereafter established, including without limitation, any amounts received in relation to any settlement of claims (including for copyright infringement) (as further provided under the Assignment of Anti-Piracy Rights to be provided by Sales Agent), all amounts collected by any collecting society, authors' rights organization, performing rights society or governmental agency, arising from all royalties, levies and remuneration imposed by law or collectively managed** including, but not limited to, royalties for secondary or simultaneous retransmission by means of any cable, satellite, microwave, Internet, Closed Network or other system, any Authorized Simulcasting or Authorized Catch-Up TV, music performance royalties, tax rebates, exhibition surcharges, or levies on blank Ideograms if the actions generating such income occur within the Territory during any applicable Distribution Agreement term, no matter when such sums are paid. **Such collections shall be deemed Gross Receipts hereunder and will be paid immediately into the Collection Account** (emphasis added).

As explained in the Declaration of Sean Walsh, this provision is an authorization to collect specific and limited monies from collecting societies and for infringement claims and not an assignment of *all* gross receipts for *all* licenses obtained by the sales agent. Some rights are "collectively managed" meaning licenses are granted and royalties collected through a central society. For example, in the United States, cable systems have a compulsory license under 17 U.S.C. § 111 to make secondary transmissions of broadcast signals but royalties are collected and distributed by the Copyright Royalty Board.[1] There are more elaborate systems in the European Union. The "Cable and Satellite Directive" (Council Directive 93/83/EEC of 27 September 1993)[2] provides in Article 8 that cable retransmission of broadcast programmes are subject to contractual authorization but Article 9 says copyright owners must exercise this right through a collecting society. *See* Paragraph 4.e: "royalties for secondary or simultaneous retransmission by means of any cable." The "Rental Directive"[3] establishes in Article 2 an

---

[1] *See* https://www.crb.gov/.
[2] Available at http://eurlex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:31993L0083:EN:HTML)
[3] The current version of Directive 2006/115/EC effective 12 December 2006 at http://ec.europa.eu/internal_market/copyright/rental-right/index_en.htm

exclusive right for rental of copies (videos) of motion pictures, authorizes in Article 4(1) "the right to obtain an equitable remuneration for the rental," and provides in Article 4(3) for entrusting the right to collecting societies. *See* Paragraph.4.e: "all royalties, levies and remuneration imposed by law of collectively managed." Some countries have also established "private copy levies" on blank videos and copying equipment to compensate for off-air home taping. Article L311-1 of the French Intellectual Property Code[4] accords authors (and others) a "right of remuneration" for certain acts of private copying. Article 54 of the German Copyright Law[5] accords authors an "equitable remuneration" payable by makers of recording equipment, but Article 54h(1) says: "claims under Article 54 … may only be asserted through a collecting society." *See* Paul Edward Geller, Editor, INTERNATIONAL COPYRIGHT LAW AND PRACTICE, *The European Union* (by Estelle Derclaye, Ben Smulders & Herman Cohen Jehoram), § 3[4][a] (2017) ("Collecting societies have traditionally operated by virtue of being mandated by rightholders, and sometimes by statutes, to collect royalties for entire national markets."); *also* Paul Goldstein, INTERNATIONAL COPYRIGHT, PRINCIPLES, LAW AND PRACTICE § 5.5.1.6(b) [2001] (describing "private copy" system). See Paragraph 4.e: "levies on blank Videograms." Note that these are very limited types of "collateral" rights and not the main licensing activity.

Examples of collecting societies are AGICOA,[6] which collects cable retransmission royalties in the European Union, and IFTA Collections,[7] which collects for producers in multiple countries. Properly speaking, the collecting societies act for an entitled "rights holder" (*e.g.*, producer). However, it is possible for a producer to authorize a third party to claim the collections on the producer's behalf. Many producers authorize sales agents to do so because dealing with the societies can be complicated. In addition, sales agents often argue that the levies arise due to activities of the sales agent (*e.g.*, cable retransmissions come from broadcast licenses

---

[4] English translation at http://www.wipo.int/wipolex/en/text.jsp?file_id=180336, current through 2010.

[5] English translation at http://www.wipo.int/wipolex/en/details.jsp?id=1034, as amended through 1998.

[6] *See* https://www.agicoa.org/.

[7] *See* http://www.ifta-online.org/ifta-collections.

secured by a sales agent), so it is appropriate for the sales agent to receive a commission on the levy income. In case of a transfer, the collection societies typically require a written authorization to ensure they are paying the proper party. This authorization is usually described as a transfer of the "right to collect." *See* Paragraph 4.e: "including the exclusive right to collect (in Sales Agent's own name or in the name of Producer and Producer hereby appoints Sales Agent as Producer's irrevocable lawful attorney-in-fact solely for such purpose)."

Paragraph 4.e also refers to "any amounts received in relation to any settlement of claims (including for copyright infringement)." Again, strictly speaking, the producer (as rightsholder) is the party entitled to pursue infringement claims, not the sales agent. However, in many cases sales agents will undertake significant activities in supporting a case, such as assembling documents and witnesses. In addition, they also argue that infringement damages compensate for lost income opportunities for a sales agent (*e.g.* video piracy reduces legitimate royalties payable by licensees), so the sales agent should be entitled to as commission on these recoveries.

The point is that Paragraph 4.e is *not* an omnibus assignment of *all* gross receipts from *all* licensing activities to the sales agent. It is an authorization for the sales agent to collect certain specific and limited types of income arising from activities collateral to the main activities in securing licenses. This income is then treated as "gross receipts" and included in the general calculation of gross receipts, meaning that the Sales Agent can collect a commission on the income and recoup costs, with the balance payable to the producer. Indeed, the last sentence of Paragraph 4.e makes clear: "Such collections shall be deemed Gross Receipts hereunder and will be paid immediately into the Collection Account."

**B.    F&D's Beneficial Ownership Is Reflected Gross Receipts Under the Sales Agency Agreement Not Adjusted Net Receipts.**

The provision in the Sales Agency Agreement for allocating income derived from licensing activities to F&D is Paragraph 10. It says in relevant part (emphasis added):

> As used in this Agreement, the term "**Gross Receipts" shall mean any and all amounts** (including without limitation non-returnable advances, overages, minimum guarantees or any other similar payments, copyright related payments such as retransmission royalties) **actually received by or credited to Producer**,

its subsidiaries, affiliates or related entities including Sales Agent or Voltage, or the Collection Agent as defined in Section 11 below, **derived from the sale, license or other exploitation of the Rights in the Territory secured by Sales Agent** and/or the Licensing Intermediaries (on behalf of the Sales Agent) from any Distributor or other party, including, without limitation, any advances, minimum guarantees, "overages", royalties, proceeds and any other license fees or receipts … For the avoidance of doubt, … all residuals and/or other reuse payments owed in connection with the Picture as required by any union or guild shall be payable from Gross Receipts prior to recoupment of any repayment amounts, other than repayment amounts to any bank or lender with a security interest ahead of such union(s) or guild(s).  Gross Receipts shall be allocated and paid in the following order of priority, on a rolling and continuous basis (emphasis added).

The point is that all monies derived from licenses secured by Goldenrod are gross receipts *for the benefit of the Producer* (F&D). These gross receipts are F&D's "beneficial" ownership interest. The deductions indicted in Paragraph 10 are generally amounts due to *creditors* of F&D, and the Sales Agent is making such payments for its benefit. But payments to creditors of F&D do not somehow turn these creditors into "beneficial copyright owners" that reduce F&D's own beneficial ownership interest.

To take an example, Paragraph 10 deals with "all residuals and/or other reuse payments owed in connection with the Picture as required by any union or guild shall be payable from Gross Receipts." Under 28 U.S.C. § 4001, "[i]n the case of a transfer of copyright ownership under United States law in a motion picture (as the terms "transfer of copyright ownership" and "motion picture" are defined in section 101 of title 17) that is produced subject to one or more collective bargaining agreements negotiated under the laws of the United States… the transfer instrument shall be deemed to incorporate the assumption agreements applicable to the copyright ownership being transferred that are required by the applicable collective bargaining agreement, and the transferee shall be subject to the obligations under each such assumption agreement to make residual payments…"  Now, a sales agency agreement is not considered a "transfer of copyright ownership" meaning that F&D, as the producer who hired the guild talent, remains liable for residual payments, not Goldenrod. The obligation to pay residuals is a contractual obligation and the guilds are creditors of the F&D so the Sales Agency Agreement provides from payment of those amounts on behalf of F&D from the gross receipts.

Similar reasoning applies to other payments under Paragraph 10. Paragraph 10 covers production costs and fees to the production lender – a creditor, not a beneficial copyright owner. Paragraph 10.b directs a specific payment of a "producer and overhead fee" ***to F&D*** – *i.e.* a direct payment of "royalties." Paragraphs 10.c-f covers payments to Goldenrod as sales agent. Paragraphs 10.g-h is payments to third party talent. Paragraph 10.i deals with other shares. The provision requiring payments to third parties in Paragraph 10 is a direction to pay, not a transfer by F&D of any beneficial interest. As such, the amount of "adjusted gross receipts" that may be eventually received by F&D is really not relevant here as it is a "net" profit after third party creditors are paid. F&D's beneficial ownership interest is the gross receipts.

This conclusion is further confirmed by Paragraph 11. It says in relevant part:

> **Each Distribution Agreement entered into by Sales Agent shall incorporate an irrevocable instruction to pay all monies due to Sales Agent or Producer directly to a collection account (the "Collection Account")**, which will he established with a mutually approved collection agent (the "Collection Agent") on the basis of a mutually approved agreement signed by Collection Agent, Producer, Sales Agent and Voltage (the "Collection Agreement"). **The Collection Agreement shall be subject to the terms of this Agreement**. … **Any Gross Receipts received by Sales Agent and/or Producer relating to the Picture and not paid into the Collection Account shall be immediately redirected to the Collection Account without deductions of any kind other than customary bank transfer charges**. … **Sales Agent and Producer shall be paid from Gross Receipts as set forth above and as provided in the Collection Agreement** (emphasis added).

The "collection account" is basically a type of security arrangement. The talent guilds, for example, want to make sure residuals are paid. Thus, they require a producer to direct all payments of gross receipts to an "escrow" (collection account) that pays them their contractual entitlement to residuals. Paragraph 11 specifically requires Goldenrod to give Vertical an irrevocable instruction to pay all royalties due under its agreement directly to the collection account – not to Goldenrod. Paragraph 11 further states if Vertical pays Goldenrod by mistake Goldenrod must immediately redirect the payment to the collection account. Paragraph 11 also provides that the Collection Agreement will be "subject to the terms of this Agreement" meaning

that the Collection Agent is to make the payments to the third party creditors of F&D described in Paragraph 10.

The Opinion and Order states on page 13: "F&D offers no argument or evidence of how money Goldenrod receives from Vertical qualifies as royalties payable to F&D." With respect, Paragraph 11 clearly provides that Vertical is to be directed to pay amounts due under its agreement to the Collection Account as "gross receipts" for the benefit of F&D, and, if Vertical erroneously pays Goldenrod, then Goldenrod must immediately pay those sums to the Collection Account.

Thus, the plain language in the Sales Agency Agreement and the Collection Agreement require all amounts due under the Vertical Agreement to be paid into the Collection Account for the benefit of F&D. To the extent Vertical has a rights for "peer-to-peer" internet distribution, this should establish F&D's retained beneficial ownership interest for such rights.

## IV.    THERE IS A TRIABLE ISSUE OF FACT WHETHER F&D IS THE LEGAL OWNER OF THE PEER-TO-PEER RIGHTS

The Opinion and Order says on page 11 that the "peer-to-peer" rights exercised through BitTorrent "falls squarely within the digital rights licensed to Vertical in Paragraph 7(a)(v) of the distribution agreement." This analysis interprets the meaning of what can best be described as ambiguous terms in the Vertical Agreement. But this interpretation is made on a motion for summary judgment. The precise issue is not what might be the ultimate interpretation but whether there are triable issues of fact regarding what this interpretation should be. Again, with respect, making this interpretation on summary judgment runs squarely against the parol evidence rule for the following reasons.

First, Paragraph 31 of the Vertical Agreement states: "This Agreement will be construed in all respects in accordance with the laws of the State of California applicable to agreements enter into and to be wholly performed within."

Second, since this court sits in Oregon, this raises a potential choice of law issue. This court should apply Oregon choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

Third, under Oregon law, when parties specify their choice of law in a contract, that choice will be effectuated unless: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue …" Johnson *v. J.G. Wentworth Originations, LLC*, 284 Or.App. 47, 53, 391 P.3d 865, 868 (2017); *M+W Zander v. Scott Co. of California*, 190 Or.App. 268, 78 P.3d 118 (2003). Neither of the indicated exceptions applies so California law should apply to the interpretation of the contract.

Fourth, interpretation of contracts is subject to the parol evidence rule in California Civil Code § 1625 and California Code of Civil Procedure § 1856. In California, the parol evidence rule is not a rule of evidence but one of substantive law. *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343, 83 P.3d 497, 502 (2004). Similarly, in Oregon, "despite its name, the parol evidence rule is a substantive rule, not a rule of evidence." *Abercrombie v. Hayden Corp.*, 320 Or. 279, 286, 883 P.2d 845, 850 (1994).

Under the older view, a court looked to the "four corners" of a written agreement to determine its meaning. California rejected this approach in *Masterson v. Sine*, 68 Cal.2d 222, 436 P.2d 561, 65 Cal.Rptr. 545 (1968) and *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage etc. Co.* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). *Masterson* reversed a trial court's refusal to consider extrinsic evidence of the intended meaning of a written option agreement because the agreement was "integrated" noting that  "conception of a writing as wholly and intrinsically self-determinative of the parties' intent to make it a sole memorial of [all the] subjects of negotiation is an impossible one." *Masterson,* 68 Cal.2d 226-227. In *Pacific Gas*, the trial court determined an indemnity clause had a "plain meaning" and refused to consider extrinsic evidence contradicting the court's interpretation. The Supreme Court also reversed: "When a court interprets a contract on this basis, it determines the meaning of the instrument in accordance with extrinsic evidence of the judge's own linguistic education and experience.' … [To] limit the determination of the meaning of a written instrument to its four-corners merely

because it seems to the court to be clear and unambiguous would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." *Pacific Gas,* 69 Cal.3d. 37.  Instead, "[t] he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas,* 69 Cal.3d. 37.  The California Legislature codified these results in Code of Civil Procedure § 1865.

As a result, "California has long abandoned a rule that would limit the interpretation of a written instrument to its four corners." *First Nat. Mortg. Co. v. Federal Realty Inv. Trust*, 631 F.3d 1058, 1067 (9th Cir. 2011). Instead, when the meaning of the words used in a contract is disputed, the trial court **must** engage in a two-step approach. *First Nat. Mortg. Co.,* 631 F.3d 1067; *Morey v. Vannucci,* 64 Cal.App.4th 904, 75 Cal.Rptr.2d 573 (1999). First, the court must "provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning." *First Nat. Mortg. Co.,* at 631 F.3d 1067; *Morey*, at 64 Cal.App.4[th] 912; *Pacific Gas,* at 69 Cal.2d 40. Such extrinsic evidence includes "the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." *Morey*, at 64 Cal.App.4[th] 912; *FPI Development*, at 231 Cal.App.3d 391. It is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. *First Nat. Mortg. Co.,* 631 F.3d 1067; *Morey*, 64 Cal.App.4[th] 912; *Wolf v. Superior Court*, 114 Cal.App.4th 1343, 1351 8 Cal.Rptr.3d 649 (2004); *Mattel, Inc. v. MCA Entertainment, Inc.*, 616 F.3d 904, 909-910 (9th Cir. 2010) (court erred in excluding extrinsic evidence whether language in agreement intended to cover ideas).

Second, if there is no conflict in the extrinsic evidence, then the court may interpret the meaning of the contract as a matter of law. If there is a conflict, then the jury must resolve the factual conflict before the court makes an interpretation. *Morey*, 64 Cal.App.4[th] 912-913 (judge

should request the jury to make special findings on disputed issues on which to base interpretation); *Wolf*, 114 Cal.App.4th 1351; *Mattel*, 616 F.3d 910.

It should be noted that under California Civil Code § 1856(g), the parol evidence rule does not exclude evidence "to explain an intrinsic ambiguity or otherwise interpret the terms of the agreement." Similarly the parol evidence rule in ORS 41.740 "… does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates… or to explain an ambiguity, intrinsic or extrinsic."

In this case, it is submitted that there is a significant factual issue about the meaning of the Vertical License Agreement. Paragraph 7.a.v does grant certain "digital rights" including dissemination over the Internet. But Paragraph 7.c.iii states "Licensor retains the right to pursue for damages, royalties and costs those individuals unlawfully downloading and distributing the Picture via the internet." This may be inartfully drafted, but the parties should be allowed to present extrinsic evidence to explain the *meaning* of the phrase. It is easily susceptible to the interpretation that the parties meant to reserve the "peer-to-peer" *rights* so that F&D could prevent infringement. Paragraph 7.c.ii also indicates that Vertical "agrees to support Licensor in the exercise of the Anti-Piracy rights" which indicates an intent that proper standing would remain with F&D. In addition, the Anti-Piracy Addendum is not merely treated as a new grant but states that the agreement is "clarified to the extent necessary and modified to effect the intent of the parties" and this is proper parol evidence to explain the meaning of Paragraph 7.c.ii.

The Vertical Agreement does refer to Goldenrod as "licensor." However, Paragraph 3.d of the Sales Agency Agreement authorizes Goldenrod "to negotiate and execute in the Sales Agent's name (on behalf of Producer) agreements with third party distributors." While this authorizes Goldenrod to deal in its own name with third parties, this does not change the legal relationship with F&D so as to make Goldenrod a grantor of rights (as opposed to an agent). Instead, if Goldenrod choses to execute distribution agreements in its own name in becomes in effect an agent acting for an undisclosed principal.  In that case, California Civil Code § 2336 says:  "One who deals with an agent without knowing or having reason to believe that the agent acts as such in a transaction, may set off against any claim of the principal arising out of the

same, all claims which he might have set off against the agent before notice of the agency." This gives Vertical an additional claim against the Goldenrod, but this does not diminish the rights of F&D.

V.    **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests this court to reconsider its prior ruling and deny defendant's motion for summary judgment.


DATED:  February 14, 2018.                HARRIS BRICKEN


                                By:  s/ John Mansfield
                                     John Mansfield, OSB No. 055390
                                     john@harrisbricken.com
                                     Megan Vaniman, OSB No. 124845
                                     megan@harrisbricken.com
                                     511 SE 11th Ave., Ste. 201
                                     Portland, OR  97214
                                     503-207-7313
                                     *Attorneys for Plaintiff*